FILED IN CLERK'S OFFICE
U.S.D.C. Gainesville

OCT 6 2010

JAMES N. HATTEN, Clerk
By: [signature] Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| JASON A. MILLER, | : | |
| Plaintiff, | : | Case No. |
| | : | |
| vs. | : | |
| | : | 2:10-cv-0206-WCO |
| CHASE HOME FINANCE, LLC, | : | |
| Defendant. | : | |

COMPLAINT

Comes now your Plaintiff, Jason A. Miller, by and through counsel, and for his Complaint against Defendant Chase Home Finance, LLC, would show this Honorable Court as follows:

Introduction

1. Plaintiff Jason A. Miller ("Mr. Miller") brings this suit against Defendant, Chase Home Finance, LLC ("Chase") for failure to honor its agreement to modify mortgage loans and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2. Plaintiff's claims are simple – when a large financial institution promises to modify eligible loans to prevent foreclosures and homeowners live up to their end of the bargain, homeowners expect that promise to be kept; especially when those large financial

Page 1 of 13

institutions are acting under the aegis of a federal program specifically targeted at preventing foreclosures.

3. In October 2008, Chase accepted $20,000,000,000.00 (20 Billion Dollars) from the United States government under the Troubled Asset Relief Program ("TARP") 12 USC §5211.

4. Thereafter, Chase signed a contract with the United States Treasury agreeing to participate in HAMP and receives incentive payments for providing alternatives to foreclosure.

5. Chase advertises that it "actively participates in the Making Home Affordable Program" and that "it is required to evaluate homeowners for a Home Affordable Modification" and, if the homeowner does not qualify, will consider other alternatives to foreclosure.

6. Plaintiff has been harmed by Chase's failure to abide by the terms of HAMP; specifically, Plaintiff has been unable to cure the default on his loan; has been unable to make his mortgage payments; and, has been unable to sell his home because the mortgage balance is greater than the fair market value of the home.

## Jurisdiction and Venue

8. Jurisdiction is based upon diversity of citizenship, 28 USC §1332.

9. Venue is proper because Plaintiff lives in this district, the property is located in this district, and defendant does business in this district, as required under 28 USC §1391(b).

10. Chase, is a business operating under the laws of the United States of America, with its principal place of business being 3415 Vision Drive, Columbus, Ohio 43219-6009.

11. Plaintiff is a resident of Georgia having as his residence 806 Sunnyside Road, Hiawassee, Georgia 30648.

Creation of the Home Affordable Modification Program

12. Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 et. seq. (2009).

13. The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C.A. §5201.

14. The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.

15. Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

16. In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

17. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C.A. §5219.

18. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures."

19. The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures on the Federal Housing Finance Agency, Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal Reserve Board in their roles as "Federal property managers." U.S.C.A. §5220.

20. On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

21. The Making Home Affordable program consists of two subprograms. The first sub- program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

22. The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

23. HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

24. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to the existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1000.00 for each HAMP modification.

### Broken Promises Under HAMP

23. The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans.

24. Should a servicer elect to participate in HAMP,6 they execute a Servicer Participation Agreement ("SPA") with the federal government.

25. Chase executed a SPA on April 13, 2009.

26. The SPA incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation".

27. The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."

28. The Program Documentation requires Participating Servicers to

evaluate all loans, which are 60 or more days delinquent for HAMP modifications. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

29. A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").

## Specific Facts about Servicing of this Loan

31. Mr. Miller has been the owner of the property located at 806 Sunnyside Road, Hiawassee, Georgia (hereinafter "the property") since 2006.

32. On March 28, 2008, Plaintiff took out a $170,000.00 mortgage loan (hereinafter the "mortgage loan") for the property in favor of United Community Mortgage Services, Inc.

33. The servicing of the Plaintiff's mortgage loan was transferred to the Defendant Chase sometime thereafter and continues to this date; though no Assignment of this transfer is of record with the Clerk of Court of Towns County, Georgia, as of September 24, 2010.

34. Soon after taking out the mortgage loan, Mr. Miller began experiencing economic hardships due to the recession which began in December 2007.

35. In February 2009 Mr. Miller contacted Chase and requested to apply for a loan modification, as advertised on Chase's website. He applied for a HAMP loan modification.

36. The Chase representative told Mr. Miller to send in a loan modification package along with 2 years of tax returns and his most recent Profit and Loss Statement. Mr. Miller did so; and, agreed to make a reduced monthly payment of $776.82.

37. On or about April 2009, Mr. Miller contacted Chase to follow up on the status of his loan modification. He was told that some the documents were missing and he should resend everything.

38. In May 2009, Mr. Miller again called to check on the status and he was told it was in review.

39. In July 2009, Mr. Miller again called to check on the status and he was told that he should submit an updated profit and loss statement. He did so.

40. In August, September, and October 2009, Mr. Miller called to check the status and was told that his file was in review.

41. In October 2009, Chase representatives asked Mr. Miller to resend copies of his tax returns and another profit and loss statement.

42. In December 2009, Mr. Miller spoke with a gentlemen who claimed to be a loss mitigation manager and who claimed that he would be making the final decision on whether Mr. Miller would receive a

modification. This gentlemen asked for another profit and loss and gave Mr. Miller a direct number fax line to send it directly to him. Mr. Miller did so.

43. In February 2010, Mr. Miller again called to check the status of his request and was told that Chase needed a profit and loss statement. He sent it in again.

44. Mr. Miller called from March through May 2010 and was told that his file was in review.

45. In May 2010, Chase stated that they needed another profit and loss statement, which Mr. Miller sent in again.

46. In August 2010, Mr. Miller called to check the status of his request and was told that the loan modification had been denied; even though by letter dated August 6, 2010, Chase told Mr. Miller that he had completed "the first step of [his] trial mortgage modification" (see letter dated August 6, 2010, attached hereto).

47. Mr. Miller's home immediately was scheduled for foreclosure on October 5, 2010.

48. Mr. Miller did not miss any payments during the pendency of the review of his loan modification application.

Breach of Contract

49. As described above, the February 2009 conversation between Mr. Miller and Chase constituted a valid offer by Chase for Mr. Miller to participate in the loan modification program..

50. By making all the payments under that offer and providing all the supporting documentation, Plaintiff accepted Defendant's offer.

51. Alternatively, Plaintiff's return of the requested documentation and making of the payments constitutes an offer and acceptance of this offer occurred when Defendant accepted Plaintiff's reduced payments.

52. Plaintiff's trial period payments to Defendant constitute consideration. By making those payments, Plaintiff gave up the ability to pursue other means of saving his home.

53. Plaintiff and Defendant thereby formed a valid contract.

54. To the extent that the contract was subject to a condition subsequent providing Chase an opportunity to review the documentation submitted by Plaintiff, this condition was waived by Chase and/or it is estopped to assert it as a defense to Plaintiff's claims by its acceptance of the payments and by its stating to Mr. Miller that he had completed the first step in the trial mortgage modification period.

55. By failing to offer Plaintiff a permanent HAMP modification, Defendant breached that contract.

56. Plaintiff remains ready, willing and able to perform under the contract.

57. Plaintiff has suffered harm and is threatened with additional harm from Defendant's breach. By making the payments, Plaintiff forewent other remedies that might be pursued to save his home, such as restructuring his debt under the bankruptcy code, or pursuing other strategies to deal with his default, such as selling his home.

## Breach of the Implied Covenant of Good Faith and Fair Dealing

58. Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

59. The purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.

60. Defendant routinely and regularly breaches this duty by:
   a. failing to perform loan servicing functions consistent with its responsibilities to Plaintiff;
   b. failing to properly supervise its agents and employees including, without limitation, its loss mitigation and collection personnel and its foreclosure attorneys;
   c. routinely demanding information already in its files;
   d. making inaccurate calculations and determinations of Plaintiff's eligibility for HAMP;
   e. failing to follow through on written and implied promises;

f. failing to follow through on contractual obligations; and,

g. failing to give permanent HAMP modifications and other foreclosure alternatives to qualified borrowers.

61. As a result of these failures to act in good faith and the absence of fair dealing, Defendant caused Plaintiff harm.

## Promissory Estoppel

62. Defendant Chase made a representation to Plaintiff that if he made the payments and returned the supporting documentation, he would receive a permanent HAMP modification.

63. Defendant's promise in February 2009 was intended to induce Plaintiff to rely on it and make monthly payments.

64. Plaintiff did rely on Defendant's representation, by submitting TPP payments. Plaintiff's reliance was reasonable. Plaintiff's reliance was to his detriment. Plaintiff has not received a permanent HAMP modification and has lost the opportunity to fund other strategies to deal with his default and to avoid foreclosure.

65. Mr. Miller timely made each of the probationary payments contemplated in the TPP Agreement due in February 2009 until August 2010, which payments were accepted and acknowledge by Chase, as evidenced by Chase's letter dated August 6, 2010.

66. Despite Mr. Miller having made timely payments pursuant

to the TPP Agreement, the Defendant proceeded to begin foreclosure proceedings against Mr. Miller's home.

67. Because of Plaintiff's detrimental reliance on the assurances of Defendant, Defendant is estopped from not accepting the payments of $776.82 and from proceeding with the foreclosure of Plaintiff's home.

Wherefore, Plaintiff prays as follows:

1. That proper service issue and be served upon the Defendant, requiring it to appear and to Answer within the time allowed by law.

2. That Plaintiff be given judgment against Defendant.

3. That the costs of this action be taxed to Defendant.

4. That such other and further relief be granted to Plaintiff of which he may be entitled.

Respectfully submitted,

_____
Peter C. Ensign, BPR #249362
6139 Preservation Drive, Suite 2
Chattanooga, Tennessee 37416
Attorney for Plaintiff
423/510-0410
Fax 423/510-1395
ensign@ensigntitle.com